All right, counsel, thank you. So we are now going to proceed to the third case on the argument calendar, United States v. Burleson. And counsel have 20 minutes aside. And, Mr. Ellman, whenever you are ready. I'm sorry, Mr. Ibert, whenever you're ready. I guess I took a 10-minute mental break as well as a physical break. I apologize, Mr. Ibert. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Mark Ibert, and I represent Mr. Gregory Burleson. And I would like to reserve five minutes of my time for rebuttal, if at all possible. In his opening statement, the lead prosecutor in this case told the jury, quote, You will hear how they, the Bundys, referred to the BLM officers as the aggressors and the trespassers, how they said the BLM was abusing the Bundy family members surrounding their house, making them shelter in place, pointing guns at them. It was all false. It was all fake, end quote. And throughout that trial, the government continued to deny the existence of snipers and all the provocative and intimidating tactics that we now know were, in fact, used. Then came the second trial, the Tier 3 trial. And the government made the exact same opening statement argument in the Tier 1 trial. In fact, it was a recurring theme in both of those cases, two cases in which all the defendants faced identical charges, where all the defendants in both trials tried to assert self-defense or defense of others based on the exact same facts that the government denied. And in the Tier 1 trial, the district court found that the Brady violations deprived the defendants of favorable evidence to support their theories of self-defense and that not a single count in the indictment could stand. Now, as far as the motion for new trial is concerned, there are only three requirements to grant a new trial in a case where there's a Brady violation. The government suppressed the evidence that's not disputed here. We all know that now. And then it has to be both material and favorable to Mr. Burleson, and it is for four different reasons, one of which is in common with the Tier 3 people. Number one, it provided evidence to support the non-criminal reasons that Mr. Burleson crossed state lines to go to Nevada. And the reasons that he did so, he told people on Facebook before he went, he told an officer at the Wash when he arrived, and he told the fake movie producers, and they were all consistent that he was going to Nevada to support the Bundys and to protect them. So why is it irrelevant that the district court, because you obviously think it is irrelevant or non-material, that the district court found to the extent, and this is, I think it's ER 10, but it's page 8 of the court's order, to the extent that any of the withheld evidence is relevant to April 12, 2014, none of it specifically involves defendant or any of the law enforcement officers that he came in contact with that day. Why is that not germane to this issue? Because what Mr. Burleson knew before he went to the Wash is relevant to a number of different things, including whether it was objectively reasonable for him to believe that there was imminent use of excessive force. And we're talking here about shooting into a crowd of mostly unarmed men, women, and children. We're not talking about a body slam, although they did that too to a grandmother and a cancer patient. But what he knew when he arrived there was, and this is not disputed, at least most of it isn't disputed because this comes from his Facebook posts, is that he knew about the snipers, he knew about the Bundys' home being surrounded, he knew about the physical abuse of Ammon Bundy, Dave Bundy, and Margaret Houston. He knew all of those things. He came to the Wash, he immediately heard a woman screaming that they were going to shoot the protesters, the men, women, and children. He goes down into the Wash and what does he see? He personally sees the agents, he sees the snipers up on the Mesa, or what he believes are snipers. He sees snipers behind the gate. He sees the agents in battle gear, in soldiers' uniforms, pointing assault rifles at the men, women, and children in the group. And there's a photograph of them at the exact moment when they say, we're going to use lethal force. But what does the withheld evidence have to do with anything that involves him and his purported self-defense defense, which is what the district was focused on, right? Right, sure. And I'm missing that. I'm missing the connection. I mean, I understand what you're saying, but I'm still missing the connection. Okay, let me get the documents. All right, the sniper evidence, again, that goes to, and again there were what appeared to be snipers at the Wash, that goes to the reasonableness of his belief that these people were prepared to shoot. And in fact, he said on Facebook before he went to Nevada, that agents were prepared to fire on innocent civilians. That's one of his Facebook book posts. And that helps, it also helps to rebut the government's repeated false statements that none of what he knew about the snipers and all that was true. It was the government that put that in issue. They started both trials saying, you'll hear from the defendants that there were snipers. They surrounded the house, that they were provocative, they were intimidating. Surrounded the house, but we're talking about the, was it April 12 episode? I'm not sure I, same question. What's the connection between what he thought he understood about what had happened before and what happened at the episode for which he was convicted? Number one, it goes to the reasonableness of his belief that there was imminent use of deadly force at the Wash. There are a number of things that go into that, but certainly what he knew about the snipers, what he knew about surrounding the house, what he knew about the excessive force that was discussed by Agent Wooten, as well as what he saw in the videos. Let me ask you about a second element where the district court said, I think ER 12, page 10 of the district court's order, the withheld evidence cannot be material to defendant's case because without a showing that law enforcement officers used excessive force on August 12, the self-defense, defense of others defense is not even available to the defendant. So why is that wrong for information that A, the defendant didn't have, and B, when there is, according to the district court, no evidence at all that excessive force was used on the 12th of August? There are two things that the district court erred in making that decision. The first is that it wasn't material, but it was the government that made it material by starting their case saying, you're going to hear these things, but they're all false. And let's say that your defense is that someone is going to kill your son if you don't do what they say. And the government says, you're going to hear that, but it's false, it's a lie, and you have no evidence. But we later find out that the government knew that it wasn't a lie, and you later find out that the government had the evidence and withheld it from you. How are you going to prove your case? They made it an issue. They made it material. The second error from the district court's point of view is it applied the wrong standard. Although I believe that pointing a gun at a bunch of men, women, and children and threatening to shoot them would meet the standard for excessive force by itself. And by the way, the district court never even mentioned that in its order, never even mentioned that they said over the bullhorn, we're going to shoot. But even aside from that, she's misconstruing what imminent or immediate excessive force means. If someone points a gun at you, cocks the hammer, points it at your head and says, now you die, you don't have to wait until the trigger is pulled to have a right to self-defense. He believed, reasonably so in my opinion, that the agents were getting ready to shoot into a crowd of mostly unarmed men, women, and children. And I pointed to or I cited to a photograph taken by the newspaper reporter who was saying, lethal force, deadly force, get the children out of there. They're telling us we're going to use deadly force. It looks down into the crowd and into the gate and you can see who's there. You can see men. You can see women. You can see children. You can see a lot of people with cameras holding up their cell phones. There are some people with guns but not trying to shoot somebody. That was a reasonable belief in something that was imminently going to happen. You said that you think the district court used the wrong standard. Can you explain that and point me to what standard the district court used, where in the district court's order it uses the wrong standard? Well, maybe what I should say is that she misconstrued the standard. The standard comes from the Spann case and the Acosta-Sierra case, and they talk about the immediate use of deadly force, and the district court in its order talked about the imminent use of deadly force. My dictionary says that immediate means, you know, without delay or within a short time of each other. But I think that the district court was simply wrong in saying they have to fire their guns before he has a right to self-defense or to the defense of others. I think that was simply a misconstrued— So you disagree with the outcome of the court's analysis under the standard, but you don't disagree with the standard that the court applied? I disagree with its interpretation of the Spann and Acosta-Sierra standard, yes. I can't imagine that self-defense is, you know, requires you to, you know, take the first bullet before you can defend yourself. And to answer the question that was— to finish answering the question that was asked before, how do these withheld documents affect him? Why are they material? Why are they relevant? In addition to rebutting the government's basically false statements about, you know, they're lying, they're paranoid, or whatever, they are relevant to the objective reasonableness of his belief, and they also support why he crossed state lines. He said to the Facebook people, before he left Arizona, I'm going, they tasered Ammon Bundy, the agents are willing to shoot innocent people. He goes up there, he sees an officer on the bridge. Before he goes to the wash, he says, I'm here to support the Bundys. Then it goes to this fake, you know, months later, this fake movie set where they're going to make him a hero and a movie star, but he says several times, I am here to protect those people. Okay, I'm here to protect them. And then he goes to Agent Caputo, and he says, you know, they were pointing their guns at men, women, and children. I want them to, don't do that. Don't point them at men, women, and children. Point them at me. Okay? And so I think that it goes to all of those things. It goes to the reason he crossed state lines. It goes to rebutting the issue that the government created in opening statement and continued throughout the case. It goes to his reasonableness, the reasonableness of his belief and an imminent deadly force. And it also impacted the denial of the jury instruction on self-defense because the district court denied the self-defense instruction based on the idea that no deadly or excessive force was used. And for the same reasons that I just said, I think that was wrong. And the only question is whether or not there is any evidence in the record that would support that defense, even if it is inconsistent, of doubtful credibility, weak. That's the Espinoza-Beza case. And if, in fact, it is wrongfully denied, that's per se reversal because that's a due process violation. I don't want to repeat everything I already said, but given what he knew beforehand, given what he's heard and saw when he arrived at the wash, there is more than enough for a self-defense or defense of others instruction. And, again, this is under de novo review. And, frankly, the reality is that Mr. Burleson didn't use any force at all. We have a 32-day jury trial, one day of which is defense evidence. And in all the rest of it, all the government agents, not one of them testified to even seeing Mr. Burleson at the wash. And, yes, let alone that he did any of the things that he boasts about the movie company. But they did identify Mr. Burleson from physical evidence depicting what occurred. They identified that he was there, and we never would dispute that. Well, they identified that he was there, and they identified him in particular pictures. Yes, but they didn't identify him doing anything that he was charged with. Well, they identified, the government claimed that what's depicted in the pictures is what he's charged with, right? Well, the only thing that the pictures, and there were tens of thousands of them, and there were videos from the air, from the ground, from above, from Fox News, from the local newspapers. What they showed him, they showed him he was present. They showed him he was no closer at any time than 75 yards from the gate. The agents were behind the gate. The cows were even farther back. And they showed him with a gun pointed at the ground. It was a lawful firearm. They don't dispute that. The lead agent at the time, I think it was Agent Love, said that, yeah, the guns are legal, and most of the time they're not a problem, they're not an issue. And it was a legal firearm in an open carry state. But his own statements were admissible, correct? Oh, his own statements were terrible. They were shocking. They were crazy. And I understand the nature of your Corpus Delicti argument, but putting that aside for the moment, his statements in the fake movie were clearly admissible, and you make no argument on appeal that they weren't, right? No. They were admissible. Once you make statements like that, you still have to have adequate corroboration, independent corroboration. Adequate, but the standard is low, as the way Corpus Delicti is normally phrased, in terms of the nature of the corroboration that's required. And it includes physical evidence, right? Well, again, the physical evidence was that he was there with a lawful gun in an open carry state pointed at the ground. I don't think it's that low because the reason for Corpus Delicti is to prevent wrongful convictions based on false confessions. And you need to show two things. One is that the crime was actually committed, and it has to be by Mr. Burleson. The government's going to tell you what the mob did, you know, what everybody did, what the 400 people did, but he was acquitted of conspiracy. He didn't know anybody in the wash, and he had no control over any of them. He came just essentially at the moment when the things, you know, erupted with the threat of lethal force. And so what is the evidence that he assaulted anybody? In order to have an assault. It's his own statement. I mean, there is that evidence. No, what's the, I just said, what's the corroboration? I get the sense you're arguing to a jury, but you made this argument to the jury, and the jury found otherwise. No, the argument to the jury was only the mere presence because trial counsel didn't have all this withheld evidence. He didn't have, and he didn't even have the opportunity to put in things about, you know, the throwdown of Margaret Houston, the tasing of Ammon and so on because that was excluded under a motion in limiting. But what he didn't have was corroboration. And not only does it have to be that Mr. Burleson assaulted someone, and I don't know how you can even have an assault if it requires the imminent fear or belief by the victim that he's being assaulted when nobody saw him. He was too far away anyway. But then you have to say, did he actually do these things? And there is simply no testimony and no photographs showing that he assaulted anyone, that he had pointed his gun at anyone, that he said anything. Nobody would have heard him anyway from 75 yards away. Nobody saw him. So I wanted to save some of my time for rebuttal. We'll give you some extra time so you can make your argument. Are there any more questions before? No. Thank you. Good morning, and may it please the court. Robert Elman for the United States. The district court denied the new trial motion because the late disclosed evidence in the Tier 1 trial was unrelated to Mr. Burleson's personal involvement on April 12th at the confrontation. That's what she says at 1ER, page 13. And it was unrelated because those materials only went to the allegation in the indictment that the Tier 1 defendants were lying in their social media campaign about the Bundy Ranch being surrounded by snipers and under surveillance in the days leading up to April 12th, but not on April 12th. Is your friend correct that in its opening statement, the government talked about things that were lies that would have been rebutted by the evidence that the government improperly withheld? What the prosecutor said in its opening is that there was a social media campaign, and it did contain lies. That's true. That's correct. And would this withheld evidence have been relevant to that argument by the prosecutor in opening statement? Could defense have argued this shows that this wasn't a lie? Well, it couldn't have changed his criminal intent. No, but that's not my question. My question is, would it have been germane to what the prosecutor said in opening statement, which is, you know, this is in large part what the government's theory was, right? I believe it would have been germane to that. But, Your Honor, the purpose for which this court concluded it was relevant doesn't apply to this case. I mean, what the court said, first of all, there's no allegation in the indictment that Mr. Burleson was lying about snipers at the Bundy Ranch. He wasn't there. He wasn't in Nevada at the time. But what the court said, and I'm quoting from page 1035 of the Bundy decision, is these documents could have helped the defense. And they're referring, of course, only to the Tier 1 defendants. It could have helped the defense show that the defendants genuinely feared the presence of snipers, contradicting the allegations that the defendants intentionally lied about being surrounded by snipers to inflame supporters. Mr. Burleson is one of the inflamed supporters. He's not one of the alleged liars. And this court has actually already rejected that very same proposition in the DeLimas case for the same reason. DeLimas, like Burleson, arrived in Nevada after the events that are addressed in that Brady material from the Tier 1 case. And in addition to that, he's claiming it's relevant to establish self-defense, but it isn't. Among the reasons that the court declined to give a self-defense instruction is that there was no evidence of excessive force on April 12th. Let's drill down on that. At page 45 of your brief, you say, Burleson also aversed the district court, ignored evidence, and then I'm going to skip ahead in the sentence, that the officers repeatedly told the crowd en masse that they would use lethal force and shoot them if they took one more step forward or did not reverse course and retreat. And immediately following that, the government says, this is irrelevant. Not that it's untrue, that it's irrelevant. So explain to me why, if someone in fact said to the crowd, I will use lethal force and shoot you if you take one more step forward, why that is irrelevant to someone who believes that there is about to be immediately used lethal force. Why would you have to have the lethal force first as opposed to the threat of lethal force? So why isn't the threat of lethal force relevant? Why is it entirely irrelevant? Well, what the law requires is the immediate use of excessive force. And these agents never used any force at all, which the district court points out. So if there were a law enforcement officer who confronted someone who's walking down the street and said to them, I am going, here's my gun, I've taken it out, I'm going to shoot you in five seconds, the person would not be able to use self-defense in that circumstance? Well, that's a completely different set of circumstances from that upon which the judge relied in this case. Because you have officers who are executing a lawful court order. They're positioned under a duty to defend the impoundment on federal land, incidentally. You have an armed mob, not an unarmed person. But it strikes me that whatever the force of that argument is, that is different than saying taking out a gun and saying to someone I'm going to use it isn't something that can trigger self-defense, which is what I took the government's brief to say. I mean, the government's brief also makes these additional points that there are other prequisites of self-defense that aren't met. But threatening to use deadly force can trigger a right to self-defense. It's not irrelevant to the right to self-defense. I understand your point, Your Honor. And it can under circumstances very different from this. You know, they're advancing against these agents who are repeatedly commanding them to stop. And these agents use no force against them. It's also, I mean, that self-defense ruling is also eminently affirmable on a number of other grounds. Remember, it's the immediate use of excessive force. Now, for one thing, you have impossibility in this case. So a couple of agents testified that they would have needed hundreds more agents in order to bring this mob under control. And I don't understand how you can use excessive force if you don't have enough force to bring this mob to heel in the first place. Well, excessive force, at least in the abstract, could be shooting into a crowd, which is what the defendant says they threatened to do, right? That could be excessive force, even if it doesn't shoot everyone. It could still be excessive force if it's unjustified. If the threat is unjustified, it can constitute excessive force because it's lethal, right? I think that overlooks or possibly conflates the other element of self-defense that's missing here, because there has to be a reasonable belief that the immediate use of excessive force is at hand. It's going to happen right now, which, by the way, is not the standard that he argued in his opening brief. He says imminent force repeatedly in that brief. But nothing in this Brady material or any other evidence indicates that any of the agents in the wash at the time had ever used deadly force unlawfully. So this whole pattern argument is wrong. At the time the agents issued that warning to the crowd, first of all, they're desperate. But secondly, that's a very reasonable response under the circumstances. Stop, desist, or we will use lethal force. They're telling them repeatedly, back away, disperse. The crowd's not obeying them. And there's no reasonable jury that would find that the agent's actions were excessive under those circumstances. Your Honor, I don't know if you're looking for the word imminent. No, that's fine. Please go ahead. Because I can point it out to you. You also have, again, burlesque and threatening lethal force in the absence of any evidence that an agent unlawfully used lethal force. But you also have expressions of intent that contradict self-defense entirely. He's going to put agents six feet under. He's going to engage in mortal combat with the agents. He's armed to the teeth as he travels from Arizona to Nevada. He shows up with a— Well, but isn't that, especially since his argument was that the jury shouldn't rely on those statements, isn't that arguments that go to why the jury shouldn't find self-defense as opposed to why there shouldn't be an instruction? I mean, the reason—I mean, they argued the jury should pay no attention to those statements, right, because he was drunk or a variety of other things, right? Well, he really gave three reasons. But doesn't that argument of yours, isn't that really a jury argument or a sufficiency of the evidence argument as opposed to whether there is sufficient evidence to support a self-defense instruction? So we're talking about the self-defense instruction, not the— Well, we're talking about both, I think. Okay. Well, let me talk about sufficiency first, then. He admits in both of his briefs that he's responding to this social media campaign, and that's what induces him to go from Arizona to Nevada. And a prominent feature, possibly the most prominent feature of that social media campaign, and there's a lot of testimony on this, is the notion that the Bureau of Land Management is stealing Mr. Bundy's cattle. So he's going to wage a range war, and he's going to do whatever it takes to keep the BLM from confiscating his cattle. That's sufficient alone to support the intent element. But in addition to that, you have him saying on that video that the agents had to give up their positions so we could go and retrieve Mr. Bundy's cattle for him. That's a direct statement of his intent. And in addition to that, you have these Facebook statements that, you know, he's imploring militia in a call to arms to aid the Bundy Ranch, which is a cattle ranch. The government's position, as I understand it, is that the Facebook statements are not the confessions that are described in the Corpus Delecti rule, but as opposed to legitimate corroborating evidence. Correct, Your Honor. Because those are not made to an agent. Correct. The Facebook, he's just posting these. He's explaining why people should go to Nevada to aid the Bundy Ranch, which, again, is a cattle ranch. And, of course, the only dispute between the BLM and Bundy is cattle grazing. That's why they're impounding the cattle in the first place. He also refers to cattle rustling in his Facebook post. He actually says wrestling, but I'm sure he meant rustling. Cattle rustling is theft of cattle. So that intent is there. And he drives directly from Phoenix to Bunkerville. And when he gets to Bunkerville, he goes right into the wash. So, I mean, he has to be saying somehow that after he crossed state lines, it occurred to him, you know, as long as I'm here, I might as well go and retrieve Mr. Bundy's cattle for him. There's no intervening event. And those three things are plenty of evidence from which a jury could infer his intent to extort these agents into giving up the impounded cattle. He was not acquitted of conspiracy in Counts 1 and 2. I think it's a peripheral point, but I just direct you to ECF documents 1998, which is the court granting the government's motion to dismiss Counts 1 and 2 a month after the trial ended, and document 1887, which is the minutes saying that those two counts were mistried, and, of course, what we cited in the answering brief for ER, page 471. The court declares a mistrial in Counts 1 and 2. And there were four days of evidence from the defendants. Mr. Burleson joined in that Rule 29a motion. He didn't file a separate motion, and then there was four days of testimony after that, but he didn't renew Rule 29a. I don't think that standard will matter given the body of evidence in this case, which the trial judge described as overwhelming, and I think that is an accurate statement. That's at 1 ER 14. So he can't establish that if this evidence, which we say is not material in the first place, for his purposes in the Tier 3 trial, he can't establish that that was likely to change the outcome of the trial. And that actually is the standard that it would probably result in acquittal. And that, of course, is from the Wagner case, which the district court relied on at page 5 of Volume 1. I don't have anything else to present unless the court has additional questions for me. Let me add, because we focused on the direct issue, let me mention another thing that has bothered me about this, and I don't know that I have a solution for it. But it seems peculiar that apparently the only person that winds up being convicted and incarcerated after all of this is not somebody anybody would identify as the more culpable parties involved in this confrontation, and somebody who is already well into his 50s, has his own physical impairments, and is facing a sentence of, what is it, 68 years? 32 years and three months, Your Honor. But then we got a lot more after that. Well, just to be clear, Your Honor, initially that sentence was 68 years, but I filed a Rule 28J motion. The court granted his motion to reduce the sentence. So his release, his projected release date is December of 2043 at this point. Still seems like an awfully long time for what it was that he was doing. And in stark contrast, what happened to everybody else who was involved? Well, as the district court pointed out, that wouldn't have been the case but for the mistrial in that Tier 1 case. So to argue that there's a disparity just ignores the mistrial. Also, he was not the only defendant sentenced to significant time. Anybody else still incarcerated? I don't know. I think Mr. Engel drew a 120-month sentence, so he may be incarcerated, but I don't know. That's wrong. That was reversed on appeal on a self-representation issue. So I don't think anyone's incarcerated except Mr. Burleson. But those are all facts that the district court took into account both at sentencing and in her ruling on the motion to reduce the sentence under 3582. And we think that the only part of that sentence that's really subject to the court's discretion is the part over and above what is now 21 years of mandatory time. And I'd just like to point out that that sentence is at the low end of the guidelines range, that it's all run concurrent, and that the court had two opportunities to reduce it if it felt that the entirety of the sentence was unreasonable. And with respect to the Dean opinion, which is cited in the reply brief, the AUSA at sentencing discussed the Dean case with the court and stated expressly that the court had the authority to sentence Mr. Burleson to 57 years or 57 years and one day under Dean and under what was prevailing Ninth Circuit law anyway. And the 57 years represented the mandatory stacked time. So the court certainly understood that from the outset. And instead of giving him one day for those five felony convictions, it gave him low end, which incidentally was 57 months lower than what the probation department recommended. So I think that's still an eminently reasonable sentence, Your Honor. If the panel has no questions, I'll waive the rest of my time. All right. Thank you. Thank you. So we'll put three minutes on the clock for your rebuttal. I'll be as quick as I can. First of all, it is true that the indictment against the tier three people had the allegation that the Bundys were misstating, lying about the snipers and all these other things, and the tier three one didn't, but they made the exact same argument. They raised the exact same issue in both trials. The only reason it was in the indictment in one and not the other is because none of the tier three people were involved in recruitment. I believe I took the word imminent from the district court's order. I could be wrong, but I believe that's where I found it. But for the reasons I've already explained, I don't see a difference here. I think that the word immediate and the word imminent, both from a dictionary standpoint, a definitional standpoint, and from the standpoint of common sense, as Judge Bennett pointed out, you don't have to wait until the bullet leaves the gun to have a right to self-defense. As to whether other elements of self-defense are not met, keep in mind again, it is only Mr. Burleson, not everybody else. I'm pretty sure that I saw the judgment as not guilty for conspiracy. But again, I think my colleague is right. It doesn't matter because either it was dismissed or it was found not guilty. I'd have to look at the judgment, but I'm pretty sure of that. As for the impossibility argument, it's not what the agents could have done. And certainly agents who think they're outnumbered, think they're cornered, are probably more likely to shoot than if they feel confident in their other abilities. But what matters is the objective reasonableness of Mr. Burleson's belief. As far as intent goes, I think that it's true that to some extent intent, for example, as to why he went to Nevada can be shown by his statements before, during, and after. And all of them, and I'm going to get to the cow statement next, all of them are consistent that he went because of the abuse he saw of the Bundys and that he wanted to help them, support them, and protect them. But as the cow statement, I mean, I think I did this pretty thoroughly in my brief, but he wasn't asked at that time, why did you go to Nevada? In that same interview, he explained multiple times that he went to Nevada to support the Bundys and to protect those people. What he's saying was what happened, but not what he did, because he said we went to get the cows. He didn't. He never got closer than 75 yards from the gate. So again, there's no corroboration even if that were the case. As for the sufficiency of the media campaign, the things that the Bundys said are not necessarily, even if he had heard the part about the cattle, even if he knew that was an issue, that doesn't mean that's why he went. He explained before, during, and after why he went. Why don't you make a concluding remark, counsel? I'm sorry? You're over your time. I'm sorry. Thank you, Your Honor. I appreciate the extra time. Thank you. We thank counsel for their argument. The case just argued will be submitted.
judges: CLIFTON, BENNETT, DESAI